### MURRAY v. D'ARCY.

(Circuit Court of Appeals, Sixth Circuit.   May 14, 1908.)

#### No. 1,769.

PATENTS—INFRINGEMENT—SPRING SEAT.
   The Murray patent, No. 692,535, for a spring seat, if conceded validity, discloses patentable invention only in the particular means shown for attaching the springs to their support. As so construed, *held* not infringed.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

W. F. Murray, for appellant.
F. L. Chappell, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge.   The appellant, who was complainant below, charges the defendant in this bill with infringing the rights secured to him by letters patent No. 692,535, issued February 4, 1902, for improvements in spring seats.   The claims which are said to be infringed are the first, third, and fifth, as follows:

"1. In a spring seat, the combination of a seat-frame, metal cross-strips having inturned edges with perforations, and flat upturned hangers at the ends to be secured to the frame, and coiled springs whose ends engage the perforations in the cross-strips, substantially as shown and described."

"3. As a new article of manufacture, a cross-strip, having both its edges inturned to within a short distance of its ends, with perforations in the inturned edges and the ends upturned to form hangers, substantially as shown and described."

"5. The combination of a frame, cross-strips secured at their ends to the frame and having inturned edges having perforations therein, and coiled springs whose ends engage the perforations in the cross-strips, substantially as shown and described."

As is seen, the first and fifth are for combinations of elements going into the construction of a spring seat, and the third is for one of the elements of such a combination; that is, for the spring support. As all the other elements were confessedly old, or clearly proven to have been so, the novel feature of all these claims is the spring support described in this third claim; and it is upon the merits of the invention of this part of a spring seat that the controversy turns. Enough of this support for the springs to enable one to understand the form of its construction and adaptations is exhibited by Fig. 3 of the drawings, which shows about one-half of it; the other section corresponding in all particulars.

The letters, a¹, a², a³, show the perforations through which the lower coil of an inverted conical spring is turned or screwed. There are four of such perforations, two on each side of the support, and it is contemplated that the spring will be turned in until it shall pass through the fourth perforation; "the spring being locked thereby securely in place because of the rise in the spiral." Much importance is attached by the patentee to the fact that in his invention he turns the edges of a flat metal strip in. What he means is shown in Fig. 3, which we have reproduced. Of this he says:

"It is seen that a cross-strip thus formed offers a greater resistance to any bending strain without increasing the amount of metal in it."

It is, indeed, readily seen. The property in a metallic strip that it offers a greater resistance to a downward pressure, in proportion to the amount of metal in it, when set on edge than when laid flat, is a matter of common knowledge, and by consequence that any approximation to a vertical position would proportionately afford the same advantage. Hunt, in his patent for improvements in spring bed bottoms, granted January 9, 1900, made use of this property by putting his metallic strips for spring supports in a vertical position, instead of laying them flat, as others had done. We may note here, also, that Hunt made perforations in this spring support through which he turned the lower coil of the spring. This secured the spring in an upright position in the longitudinal direction of the spring support, but not laterally; this being provided for by a cross-strip. And Hoey, in his patent of 1901, had employed the same principle when he made his spring supports of a tube perforated at the top and bottom, and

taking down the straightened end of his springs through these per-
forations. This held the spring rigidly upright. Murray took the
upper half of Hoey's tube and claims the same advantage from it,
namely, that turning some parts of it into a vertical position makes
it stronger than if it lay flat. This same idea was pressed upon us as
one of novelty in American Carriage Co. v. Wyeth, 130 Fed. 389,
391, 71 C. C. A. 485. But it was answered that the idea was old and
familiar. D'Arcy takes the lower half of Hunt's tube. He prefers
to make it in a V-form, but says it may also be made in a U-form,
which is undoubtedly the same in principle. We think there was noth-
ing patentable in the material or shape of complainant's spring support.

There is nothing left in which to find invention, except his peculiar
device for attaching the springs to their support. This was done by
making round "holes," as he calls them in his specifications and shows
them in his drawings, adapted to the size of the wire of his coils, and
turning the lower end of his coil around through the holes, as he
says, "in a manner similar to that used in driving a screw." We have
already noticed that Hunt made like perforations in his spring sup-
port; but that was quite vertical, and not partly so, as in Murray's.
In a patent granted to Cloyes in 1898, flat metallic strips were used,
and "tongues were struck up from the body of them and bent down
over the coil of the spring, closely upon the strip." Entire loops were
struck up from the spring support in Fortney's patent of 1896, through
which the lower coil of the spring was turned. Van Cise, in his pat-
ent of 1896, shows a "long wide loop" struck up from his flat metal
spring support. "These loops," he says, "are of suitable length to
take one coil of the spring inside the slot so formed." This is simi-
lar to the slot in the spring support of the defendant, to be noticed
later on. Other similar forms of spring supports are shown in pat-
ents earlier than Murray's. None of them, however, shows exactly
the same construction. But enough has been recited to indicate that
Murray's invention stands on very narrow grounds. Other and ear-
lier modes of securing the springs in such structures upon their sup-
ports crowd his invention on every side, and the best that can be
said for it is that it may be valid for the particular means which he
devised and explains in his specifications. And so much we are in-
clined to concede to it, in view of the presumption afforded by the
grant of his patent, notwithstanding it would seem that, upon adopt-
ing the principle of strengthing his spring support by turning down its
edges, the old art would naturally suggest to him this manner of seating
his springs.

Construed, as we think the Murray patent must be, as extending
in respect of patentable novelty only to his particular method or means
of attaching the springs to their support, it follows that there is no
infringement. The springs of the complainant are attached by turn-
ing them through the holes on opposite sides, and they become fixed
in their position by friction induced by the rise in the spiral of the
coils. In the defendant's, they are first collapsed at the lower end
and pushed in under tension through slots in the support. There the
provisional tension is released, and the resiliency of the collapsed coil
of the spring expands it against the ends of the slot, and the position

of the spring is thereby secured and maintained.  Murray's spring support has no adaptation for D'Arcy's method of seating the springs upon their base, nor could D'Arcy seat his springs upon Murray's base without altering it into a different structure from that which Murray described and claimed.  It was precisely upon this distinction that the examiner of the Patent Office distinguished D'Arcy's invention from Murray's, and upon which the patent to the former was allowed.  Judge Knappen founded his conclusion in the court below upon the same ground in a well-reasoned opinion.

The decree of the Circuit Court must be affirmed, with costs.