## MURRAY v. DETROIT WIRE SPRING CO.

(Circuit Court of Appeals, Sixth Circuit. May 17, 1918.)

### No. 3109.

1. PATENTS ⬤⟶328—VALIDITY AND INFRINGEMENT—SPRING SEAT.
    The Murray patent, No. 692,535, for a spring seat, in view of its narrownesss, held not infringed.

2. PATENTS ⬤⟶310(10)—SUIT FOR INFRINGEMENT—AMENDMENT OF PLEADINGS.
    Denial of motion by complainant in infringement suit to amend bill to show marking of his goods in compliance with statute held discretionary, where motion was made after testimony had been taken on accounting, and that did not show such compliance.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in equity by William A. Murray against the Detroit Wire Spring Company. From final decree, complainant appeals. Reversed.

W. F. Murray, of Cincinnati, Ohio, for appellant.

Barthel & Barthel, of Detroit, Mich. (C. R. Stickney and Otto F. Barthel, both of Detroit, Mich., of counsel), for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

KNAPPEN, Circuit Judge. Appeal from the accounting decree in suit for infringement of patent No. 692,535 to Murray upon spring seat. Defendant's so-called "four-hole strip," which was originally the only structure in issue, had been held to infringe. Murray v. Detroit Wire Spring Co., 206 Fed. 465, 124 C. C. A. 371. On the accounting it appeared that defendant had discontinued the manufacture and sale of the four-hole strip at about the time the bill for infringement was filed, and had since been making and selling a "three-hole strip," which it claimed did not infringe. The master held the three-hole strip to infringe. Plaintiff had not alleged in his bill that he had marked with the word "Patented" his articles made under the patent, as provided by section 4900 of the Revised Statutes (U. S. Comp. Stat. 1916, § 9446); and the master found that defendant had received no notice of the patent previous to notice of the infringement suit. Plaintiff's motion for leave to amend the bill by averring such marking was denied by the master, and his action sustained by the District Judge. The master found and assessed plaintiff's damages on account of the three-hole construction at upwards of $59,000, computed from the date of notice to defendant of the infringement suit. The District Judge, by reason of the decision of this court in Murray v. Greeno, 234 Fed. 91, 148 C. C. A. 107, announced since the master's decision, held the three-hole construction not to infringe, and accordingly awarded plaintiff 6 cents damages, requiring each party to pay one-half the special master's fee.

Appellant contends, first, that the three-hole construction infringes, and that the master's award of damages should be sustained; second, that he should have been allowed to amend his bill as asked; third, that the accounting with respect to the four-hole construction should run from the time actual infringement began, or at least from the time of a claimed notice of infringement in the fall of 1908; and, fourth, that plaintiff should not have been required to pay one-half the master's fee on accounting.

[1] 1. Infringement. The dominant element of all the claims in suit is the metallic cross-strip with inturned or downturned edges (forming in cross-section an inverted V or U), with perforations in the edges engaged by the lower end of a spiral or helical spring seated thereon. The specification shows and describes the perforations as "four holes" "in the same horizontal plane," and the application of the spring by inserting its lower end in one of the holes, whereupon "the spring is rotated in a manner similar to that used in driving a screw, thereby carrying the end of the spring forward successively through the three remaining holes, the spring being locked thereby securely in place because of the rise in the spiral."

The patent was first before this court in Murray v. D'Arcy, 161 Fed. 352, 88 C. C. A. 364. It was there held valid, but entitled to only a narrow range of equivalents. It was construed as "extending, in respect to patentable novelty, only to [the patentee's] particular

method or means of attaching the springs to their support," which resulted in their becoming "fixed in their position by friction induced by the rise in the spiral of the coils." The patent was held not infringed by a structure in which the spring was seated by first collapsing it at the lower end and pushing it in under tension through perforated slots in the supporting strip.

The instant case, as first here (206 Fed. 465, 124 C. C. A. 371), involved the question of infringement by the O'Brien structure. We again held Murray's patentable novelty to consist "in that support against lateral bending in any direction and that vertical maintaining of the spring, which support and maintenance were given by the four perforations in the arched strip," saying:

"Having these four bearing points in the same horizontal plane, the rise in the spiral between bearing points caused, at these four points, top and bottom friction, which, when the lower coil was screwed in through the holes, would tend to prevent it from unscrewing and to hold it rigidly with reference to the spring's vertical axis."

We held that the O'Brien structure, which had, as had Murray's, four perforations in pairs and in the same horizontal plane, embodied the characteristic invention of Murray, and that infringement was not escaped by the fact that this function was impaired by slightly narrowing the arch and enlarging the perforations—such impairing being compensated by adding horizontal flanges at the lower edges of the strips and offsetting the bottom spiral coil between the arch walls, so that the spring cannot unscrew. This we held not substitution, but addition.

In the Greeno Case, supra, the alleged infringing strip had four perforations, through which the lower coil of the spring was inserted; but the perforations were not in the same horizontal plane, the difference between the horizontal planes of the two sets of perforations being the same as the rise of the spiral. The spring was required to be locked in position by compressing the lower coil of the spring against the support. We found that there was no appreciable distortion of the spring due to its entering the support, and no appreciable friction due to the rise of the spiral, and thus that the device lacked the feature of Murray's patent which alone gave it validity, viz. the holding of the spring in position by friction due to the rise of the spiral.

Defendant's three-hole construction, now in issue, is the O'Brien strip with one of its four perforations (the last used in the original process of seating the spring) omitted. Its three holes are thus in the same horizontal plane. The question is: On which side of the line, as defined in our former decisions, does the case fall?

Assuming that infringement would not be avoided by dispensing with one of the four perforations, provided the characteristic feature of Murray is nevertheless retained, that is to say, provided the spring is locked in position by the "top and bottom friction induced by the rise of the spiral," the determinative question is whether it is so locked. We think it obvious that the lower coil would not be distorted by merely passing it through the three points in the supporting strip.

It is true that, when the spring is in position perpendicularly to the strip, there is a very slight distortion in the lower coil, which would enable the spring, when not in use, to stand alone, as indeed was the case with the Greeno construction; but it seems clear from inspection that the distortion is not such as to contribute to any appreciable extent in holding the spring in position for actual use. Its contribution in that direction seems to us no more appreciable than that of the structure held in the Greeno Case not to infringe. In the three-hole device in question the spring is actually locked in position by means of a slight upsetting of the coil between the first and second perforations, and by a turning down of the end of the wire (after passing through the three perforations) against the inner wall of the arched strip. It is obvious that without some substantial holding means additional to the insertion of the coil of the upright spring through the three perforations no practicable seating is effected. These considerations, to our minds, effectively distinguish the three-hole construction from the four-hole O'Brien structure.

In view of the narrowness of the patent, and its history in this court, we think the District Court rightly held it not infringed by defendant's three-hole construction.

[2] 2. The Motion to Amend the Bill. It is the settled construction of the statute (Rev. Stat. § 4900; U. S. Comp. Stat. 1916, § 9446) that if a patentee makes or sells the article patented he—

"cannot recover damages against infringers of the patent, unless he has given notice of his right, either to the whole public by marking his article 'Patented,' or to the particular defendants by informing them of his patent and of their infringement of it. * * * By the elementary principles of pleading, therefore, the duty of alleging, and the burden of proving, either of these facts is upon the plaintiff." Dunlap v. Schofield, 152 U. S. 244, 247, 248, 14 Sup. Ct. 576, 38 L. Ed. 426; Coupe v. Royer, 155 U. S. 565, 584, 15 Sup. Ct. 199, 39 L. Ed. 263.

Upon the accounting before the master plaintiff testified, apparently without objection, that:

"All goods containing my patented construction were packed in cases and were shipped in bundles to the trade. In the cases I put a memorandum bearing the date of the patent, and upon the bundles I secured a tag bearing the date of the patent. * * * After the bundle was opened for use, there were no means of telling from the supports or strips whether or not they were patented."

There was produced a copy of the memorandum said to have been put inside the cases, as well as a copy of the so-called "shipping tag" put on the bundles of strips. Neither of these documents is in the record, or sent up with it, and we are not informed, except as stated, of their contents. It was not until after the master had held (nearly four years after the bill was filed) that the plaintiff had failed to give valid notice to defendant of its infringement prior to notice of the infringement suit that plaintiff moved to amend his bill, by inserting an averment "that such spring constructions, sold by your orator, were marked with the words, 'Patented February 4, 1902.'" The motion was not accompanied by any statement of reason for failure to so aver in the bill, or for the delay in asking leave to amend. When its

omission was discovered does not appear. It satisfactorily appears that the individual strips were not marked "patented." The record does not contain enough to clearly show that plaintiff in fact complied with the statute. No reason was given by either the master or the District Judge for denying the motion to amend. It may have been either for delay in applying, or because statutory compliance was not thought to be shown. Upon this record it cannot be said that discretion was abused.

3. The Date at Which the Accounting as to the Four-Hole Construction should Start. The substance of so much of the testimony requiring mention as relates to notice to defendant previous to the infringement suit is this: Mr. Young, president and general manager of defendant, who was an officer of that company from July 15, 1908, in answer to a question whether he had correspondence with plaintiff "a year or so prior to the filing of the suit in relation to the construction which you were manufacturing," testified:

"Speaking from a personal standpoint, I did not. My predecessors [presumably meaning the National Cutlery Company] had some communication from an attorney, I believe, representing the William A. Murray Company, and the matter, as I understand, was turned over to E. S. Wheeler, a patent attorney here, to take up the matter with them, with the result that they did nothing further at that time."

There was testimony that in 1906 Wheeler mailed defendant, apparently at the request of the National Cutlery Company, several patents, including "two to Murray," one of which would seem quite naturally to be the patent in suit. Plaintiff testified, on the hearing previous to the interlocutory decree, that prior to bringing this suit he had notified defendant that it was infringing upon complainant's patent. There was no testimony in denial. On the accounting he testified that in the fall of 1908 he had sent defendant a copy of a circular notice containing the decision in the D'Arcy Case, which he says was a general notice to manufacturers of springs that the Circuit Court of Appeals had declared his patent valid, and a warning to such manufacturers to cease manufacturing at once and to account to him. Later he said the notice was sent in "the latter part of 1909." Plaintiff had, however, no copy of the letter claimed to have been sent defendant; his copy book having been destroyed by fire. Young testified that he never saw any National Cutlery Company correspondence, that he had no correspondence himself with plaintiff before the infringement suit was begun, and that, while he had previously seen the Murray strip at different times, he had never examined it, to the extent of knowing its features, until after suit was begun. We are not cited to, nor have we found, any denial otherwise of plaintiff's testimony referred to, nor of the receipt by defendant in 1906 of the Murray patents.

The master was of opinion that plaintiff had failed "to bring any positive notice of the alleged infringement home to the defendant prior to the commencement of this suit," that plaintiff's letter to the National Cutlery Company was not the notice of infringement contemplated by the patent laws, and that defendant's successorship to

the National Cutlery Company was not sufficient to warrant accounting by defendant from the date of plaintiff's letter to that company, especially as complainant, with knowledge of defendant's alleged infringement, permitted it, by his own inaction, to continue infringing for nearly four years, and until the bill was filed, and that there was no "good and sufficient proof" of the mailing to defendant of the alleged notice of 1909.

Had there been specific denial of the receipt by defendant, first, of the Murray patents in 1906 (not mentioned by the master), and, second, of Murray's notification by letter in 1908 or 1909, and had all the testimony been taken before the master, we should be disposed to accept his conclusions. But in the absence of such denials, and as some of the testimony was not taken before the master, we are constrained to believe that defendant had at some time before the infringement suit was begun notice fairly apprising it of plaintiff's claim that it was infringing. It may well be that the bare receipt of the Murray patents in 1906 did not mean much to defendant as matters then stood; but it would seem that the subsequent notification of the result of the D'Arcy suit, coupled with a warning to cease manufacturing, in connection with the previous receipt of the patents and defendant's interest in the subject-matter, was a sufficiently substantial notification to require defendant to act at its peril. In view of the uncertainty as to the precise date of the notice of the decision in the D'Arcy Case, we are disposed to think that justice will be done by carrying the accounting date back to the end of the year 1909; and to that extent the decree for accounting as to the four-hole structure will be modified.

4. We see no reason for disturbing the action of the court below with respect to the division of the master's fee.

The decree of the District Court will be reversed, and the record remanded to that court, with directions to award an accounting as to the four-hole construction from December 31, 1909, and to take further proceedings not inconsistent with this opinion. The costs of this court, including expense of preparing and printing transcript, will be divided.